UNIVERSAL CHEMICAL CORPORATION v. CARBIDE & CARBON CHEMICALS CORPORATION et al.

No. 20412.

District Court, N. D. Ohio, E. D.

Aug. 3, 1944.

Clair V. Johnson and D. A. Woodcock (of Watson, Bristol, Johnson & Leavenworth), both of New York City, and John Duncan (of Squire, Sanders & Dempsey), of Cleveland, Ohio, for Carbide & Carbon Chemical Corporation and S. C. Johnson & Sons.

J. Ralph Barrow, of Akron, Ohio, and A. H. Van Horn (of Hawgood & Van Horn), of Cleveland, Ohio, for Universal Chemical Corporation.

FREED, District Judge.

Plaintiff, Universal Chemical Corporation, briefly referred to as Universal, brought this action in which, as assignee of United States letters patent No. 2,177,-240, issued to one Brumbaugh on October 24, 1939. It seeks injunction for infringement of its patent by Carbide and Carbon Chemicals Corporation, referred to as Car-

bide, and S. C. Johnson & Son, Inc., referred to as Johnson, and accounting for profits.

The claim is made that these defendants wrongfully provoked interferences by copying the patent and the claims, that they collusively engaged in a conspiracy to defraud plaintiff of its patent and to induce others to infringe the patent with guarantees of immunity. It is asserted that the wrongful provocations of the interferences and misrepresentations were made for the purpose of wrongfully diverting to defendants, business rightfully belonging to plaintiff which constitutes unfair competition.

The defendants, in substance, deny the validity of plaintiff's patent. They deny infringement and contend that plaintiff and Brumbaugh first acquired knowledge of the product which is the subject matter of this controversy from one Alexander L. Wilson and others, that Alexander L. Wilson had filed an application in the United States Patent Office disclosing and substantially claiming the invention set forth in the Brumbaugh patent long before Brumbaugh's alleged invention. They further deny any acts of misrepresentation or that they engaged in unfair competition. By way of counterclaim the defendants pray for a declaratory judgment to have United States letters patent No. 2,177,240 declared to be invalid and void and that the defendants and their customers are not liable as infringers.

After a lengthy trial, an additional hearing was granted on plaintiff's request because of the physical incapacity of its counsel. Unusually extensive briefs were filed which plainly disclosed that the dispute is purely factual and that there is no substantial disagreement between the parties as to the legal consequences which flow from the facts.

It appears from the record that the defendant, Carbide, guaranteed to defend Johnson and its other customers against any charges of infringement in the use of two amines, triethanolamine and morpholine which it manufactures and sells among other organic chemicals. It maintained a fellowship at the Mellon Institute of Industrial Research for new discoveries in the use of its products.

The plaintiff, Universal, assignee of the questioned patent, formerly manufactured and sold "bright drying" and "rubless" emulsion floor polishes under the trade name "Unico."

The defendant, Johnson, manufactures and sells a wax polish under the trade name "Glo-Coat" made with triethanolamine emulsifier which it purchases from Carbide, and "No-Buff, Brown Label" wax polish made with morpholine emulsifier which it likewise purchases from Carbide.

Gathered from the two claims in the patent in suit [1] the invention pertains to a wax composition or polish in the form of an emulsion which produces a bright finish without rubbing. Both claims contain the important characteristic of requiring the holding of the wax "dispersed in such small particle size that it will dry bright or with substantial lustre when merely applied to a surface and exposed to the atmosphere without rubbing."

Fatty acids of high molecular weight such as oleic acid and a wax material are compounded with either morpholine compound or an unstable volatile amino compound. The emulsion is produced by the melting of the wax and the oleic acid to which water is added at certain temperature.

The plaintiff contends that it has supplied the long felt want of a water resistant

---

1 1. A wax composition comprising an emulsion of wax in water having therein as an emulsifying agent a morpholine compound with a fatty acid of high molecular weight, holding the wax dispersed in such small particle size that it will dry bright or with substantial lustre when merely applied to a surface and exposed to the atmosphere without rubbing, said emulsifying agent being decomposable by drying of the composition whereby the composition loses its ability to re-emulsify in the presence of water.

2. A wax composition comprising an emulsion of wax in water having therein as an emulsifying agent an unstable volatile amino compound with a fatty acid of high molecular weight, forming a wax-soluble soap, so as to hold the wax dispersed in such small particle size that it will dry bright or with substantial lustre when merely applied to a surface and exposed to the atmosphere without rubbing, said emulsifying agent being stable in the presence of the water and not evaporating selectively in water solution but decomposable by the drying of the composition whereby the composition loses its ability to re-emulsify in the presence of water.

wax polish which no one before had been able to accomplish.

A complete analysis of the record discloses that plaintiff's contention is predicated on its claim that it found a new "technique" for manufacturing such a wax polish. It is maintained that neither the prior art, nor the disclosures made, brought about the desired result. The essence of the invention appears to be the "method" of adding the water to the various substances hereinbefore enumerated. The patent application describes it in this language: "The wax and oleic acid are melted with gentle heat, preferably in a steam jacketed kettle. The temperature should not exceed 105 degrees centigrade at any time. The heat is then controlled so as to bring the temperature to 105 degrees centigrade. Heating is then discontinued and the morpholine is slowly added with continuous gentle but thorough agitation; this agitation being continued for three minutes after the last has been added. The temperature will have dropped to about 98 degrees centigrade. The temperature is adjusted to 98 degrees centigrade if it varies by more than plus or minus one degree. The morpholine is wax-soluble to such an extent as to produce wax emulsions of very small particle size. Six gallons of boiling water are then added at a slow regular rate over a period of about three minutes, agitating continuously as above and for approximately five minutes thereafter. The remainder of the water at boiling temperature is then added very rapidly (in about 10 seconds) and stirring is continued until the emulsion is homogeneous and none of the concentrated emulsion mixture remains undispersed. The entire quantity is then cooled to room temperature by pumping it through cooled coils or other suitable cooling equipment. This cooling process should preferably be as rapid as is practical requiring not more than 5 to 10 minutes."

Carbide and Johnson, among other matters, rely on the defense that Brumbaugh was not the original inventor; that long prior to the date of the invention claimed by Brumbaugh, the product allegedly invented by him and the method of compounding it was disclosed to Brumbaugh by Carbide's employees; that the prior art left no margin for invention; that the alleged invention was known to Alexander L. Wilson prior to Brumbaugh's alleged date of invention, as disclosed in Wilson's application for letters patent in 1936; and, further, that Wilbert Products Company and others, following Wilson's disclosure to them, manufactured and sold the patented product prior to Brumbaugh's conception date.

These contentions made by Carbide and Johnson were so firmly established by the evidence that discussion of other issues raised would be futile. That Brumbaugh was not the original inventor, and that Carbide employees disclosed the product covered by the claims and the method for preparing it, is manifest from the mere reading of the correspondence offered in evidence.

Plaintiff's Exhibit No. 3 contains the carbon copy of a letter dated February 10, 1936, written by Brumbaugh to Carbide in which he writes:

"Since my interview with you several months ago we have experienced no further difficulties in the production of our water emulsion floor wax.

"Our one outstanding weakness to date in this product is a lack of sufficient water resistance. The sample you gave me is certainly far superior in this respect to our own product and I am very much interested in the use of Morpholineaoleate as the emulsifying agent. * * *"

In reply, on February 13, 1936, B. G. Wilkes, an employee of Carbide, said in part as follows:

"This is in reply to your kind letter of February 10, 1936, in which we note with interest your enthusiasm over the properties of the rubless wax polish, a sample of which you obtained from us on your recent visit. * * *

"As requested in your letter, we are attaching detailed directions for the preparation of the polish which you received in those laboratories."

The directions for the preparation of the polish formulated by A. L. Wilson, another employee of Carbide, were enclosed with the letter.

The contents of this correspondence convinces this court that Brumbaugh looked to Carbide to solve his problem of obtaining the method and the constituent parts of the product, a water resistant wax polish, bright drying without rubbing. It is apparent that when Carbide supplied him with morpholine that the difficulties which he

experienced were eliminated. His contentions at the trial, several years later, that Wilson's directive did not answer his needs which he did not indicate to Carbide at the time, do not overcome the clear meaning of his letters and the other proof that Wilson's method produced the patented product.

The letter which Brumbaugh addressed to Wilkes, of Carbide, on March 24, 1937, in which he wrote:

"I have your letter of March 23 with the further information on the morpholine wax polish relative to uneven drying.

"We have noted that the tendency to creep is less pronounced after the shellac has been added, and believe as you suggest that with this addition and when the wax is aged, and through perhaps a slightly higher wax concentration that we will have a satisfactory product in this regard.

"I wish to express again my appreciation for all your valuable suggestions and helps and will drop you a line occasionally to let you know how we are making out with these products. At present we are delayed just a little because of the difficulty of obtaining an additional supply of Morpholine, but will continue in the near future when it arrives."

is in direct contradiction of any such assertion by Brumbaugh.

In this connection it should be recalled that Wilkes and Wilson were employed by Carbide, that Wilkes was doing research work at the Mellon Institute, and that Carbide manufactured and sold to wax manufacturers chemicals to make waxes. It was definitely in line with Carbide's creation of business outlets to experiment and advise its customers relative to the effective use of its chemicals.

This court is in accord with the assertions made by Carbide and Johnson that the discussion of the use of morpholine in an article written by A. L. Wilson, and published by Industrial Engineering and Chemistry in August of 1935, the Charles S. Glickman article "Water Emulsion Waxes" in May 1936, and the paper "The Preparation of Emulsions and Other Products with Triethanolamine $N(C_2H_4OH)_3$" in October of 1936, all point to the inescapable conclusion that after their publication it was within the skill of the ordinary worker in the art to prepare the product recited in the claims of the questioned patent.

The evidence adduced is most conclusive that the product manufactured under Wilson Example III, contained in his application for letters patent in October of 1936, in which a formula and technique for manufacture of wax emulsion are disclosed, satisfied all of the requirements in Brumbaugh's claims. The testimony in this regard by the witnesses Kimball and Wassel, of the tests made under Wilson Example III and the results obtained, is convincing. There is no foundation whatever for the doubts cast by plaintiff upon either their ability or qualification to make the tests or the sincerity of their utterances on the witness stand.

The conclusion follows that long prior to Brumbaugh's alleged date of invention, the invention was known to Wilson.

The testimony that Wilbert Products Company was selling the patented product after that company received the identical Wilson directive of formula and technique for the manufacture of bright drying morpholine emulsion, sent to Brumbaugh dated January 3, 1936, is no less persuasive.

The invention here in dispute is a product invention. Even if the court assumed that Brumbaugh's new technique of either dumping the wax into the water, or dumping the water into the wax rapidly, improves the method disclosed in the Wilson application and used by Wilbert and others, it cannot be said that Wilson's teachings failed to show how a product corresponding to the Brumbaugh counts can be produced. It is manifest from the record that Wilson's product dries with substantial brightness or lustre and it is water resistant.

This court attempted to discover the basis for the charge of fraud made in the complaint as well as in the course of the trial, but is bound to reach the finding that it is baseless.

The petition will be dismissed and the defendants' prayer in the counterclaim will be granted.